KERMIT CHAPMAN & SONS, INC., APPELLANT, *v.*
LINDLEY, TAX COMMR., APPELLEE.

[Cite as Kermit Chapman & Sons, Inc., v. Lindley (1977),
60 Ohio App. 2d 233.]

(No. CA-4681—Decided December 21, 1977.)

*Messrs. Black, McCuskey, Souers & Arbaugh,* and *Mr.
Terrence P. Kessler,* for appellant.

*Mr. William J. Brown,* attorney general, and *Mr. James
C. Sauer,* for appellee.

DOWD, J. This appeal presents the issue of whether certain personal property of the appellant comes within the R. C. 5701.08 (B) agricultural exception to R. C. 5709.01, so as to exempt it from the imposition of personal property tax.

The appellant raises vegetables in the Hartville area (famous for its black muckland) on over 200 acres. The vegetables include leaf lettuce, radishes and onions. As a part of its operations, the appellant maintains a "packing house" facility where freshly picked produce is water cooled and packaged prior to shipment to whole-sale commission houses. The appellant does not engage in retail sales. All marketing is through commission houses and all produce is shipped in single-product lots.

The Tax Commissioner of Ohio determined that the appellant was liable for personal property tax for the machinery, equipment, furniture, fixtures and supplies used in its "packing house" operation. The Commissioner held that such items were taxable. He stated: "* * *[T]he statutory exemption does not apply to machinery and equipment which is used to process and package agricultural products; the exemption is strictly construed and limited to personal property

actually used in the agricultural operation, consisting of planting, growing and harvesting of crops."

On appeal, the Board of Tax Appeals affirmed, declaring "the mechanical apparatus which cools, bags merchandise and otherwise handles products grown by the appellant are utilized more in commercial merchandising than in agriculture."

On appeal to this court, the appellant contends that the treatment of the produce in the "packing house" operation is essential to a preservation of the vegetables in edible form and as such constitutes the last stage in the harvesting process.

*Benken* v. *Porterfield* (1969), 18 Ohio St. 2d. 133, addressed the issue of the meaning of the word "agriculture" in the context of the favored statutory treatment granted the farming industry with respect to personal property tax. In *Benken,* the Board of Tax Appeal's definition of "agriculture," given tacit approval in *Yoder Bros.* v. *Bowers* (1959), 169 Ohio St. 211, and described in *Benken* as limited to the "planting, care and harvesting of crops in large quantities in large fields," was rejected as overly limited and replaced by the definition in Webster's Third New International Dictionary (1961), describing agriculture as the "science or art of the production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal."

We first consider that phase of the appellant's operation designed to cool and package the lettuce crop. George May, an employee of the appellant called to testify on behalf of the appellant before the Attorney-Examiner of the Board of Tax Appeals, on direct examination, described the lettuce operation as follows:

"Q. Would you describe the methods by which the lettuce is harvested?

"A. The crop, such as escarolle, Boston, and Bibb lettuce, these are cut in the field and packed in—normally bushels and No. 9 crates called a Universal crate and they are packed in the field.

"Q. This is a hand operation?

"A. It is a hand operation.

"Q. What happens from the time—use, for example,

Bibb lettuce as cut by the field workers, and put in one of these crates?

"A. Well, you have to be very concerned about making certain that it does not stay in the field once it is cut because it will wilt and it is all over. So, very quickly, you get it into an area where you can run some cold water on it to take out the field heat.

"Q. How is Chapman's operation set up to get the crates from the field into a place where it can be cooled down?

"A. We have what we would call field trucks which are just a flat-bottomed truck and it would haul from the field into the area where you could run some water over the produce.

"Q. Would you describe for the Board the machines that are the subject of this appeal and tell us just what their function is?

"A. Well, one of the pieces of equipment is called a hydro-cooler***. And what a hydro-cooler is, it is a piece of equipment that would have a rack affair which would have a continuous tread where the crates that you had packed in the fields would be set onto these and there would be a little conveyor where it would go on the hydro-cooler and then there is water pumped over the top of this and it circulates and goes down to the produce to cool it. Now, the produce is put on these conveyor belts and run through it and there is no actual cleaning.

"Q. That is all incidental to the cooling off process?

"A. Right.

"Q. What would be the result if your escarolle were not cooled off when it came out of the field?

"A. Well, it would be garbage.

"What it amounts to, if you cut a head of lettuce or endive or escarolle, whatever it would be, and just allow it to, let's say, stay in the field during the summer at 85 degrees, within an hour it would just wilt down completely, so you must immediately do something with it.

"Q. Mr. May, after the produce is cooled in the hydro-cooler, what happens to it?

"A. Well, the next thing after it comes off of the hydro-cooler, it would be put on the truck to transfer it directly to market."

"Q. What I am trying to do, Mr. May, is we have been a little disjointed in the way we approached the operations, and I would like to put it into one summary form for us.

"A. O.K. Whenever the produce would be cut in the field, it would be, within a few minutes, loaded onto a flat-bottomed truck, the crates, and that would be immediately driven to a building where the hydro-cooler is. The crates would be placed onto a little bit of a conveyor that would run it through this hydro-cooler and you would have someone at the other end of the hydro-cooler that would set it off.

"On the hydro-cooler—it has a top to it with perforations in the metal and the water is pumped onto this top like, and it just falls down through, or runs down through these holes on the crates of produce and that runs straight down to the bottom of the hydro-cooler and it is just recirculated. You can keep putting fresh water in, but you can also recirculate it. It has a pump on it.

"The person at the other end of the line would just take it off of the piece of equipment and put it on a skid; and normally there would be a truck right there and we would turn around and set the skid on the truck and away we would go.

"Q. Mr. May, is there any effort made at any time to mix a final product, say any kind of a processed salad or anything like that at the operation?

"A. No. In other words, it is a head of lettuce in the field and it is a head of lettuce when it is put on the truck and we sell it as a crate of lettuce."

Additionally, Mays described, on direct examination, the function of the tri-pack ice crusher:

"A. Whenever we load the trucks, that is always put on insulated trucks because—and these are people that are out for hire. It is put on the truck and they would have a thermal cooling unit or some other cooling unit on it, but we have always used ice to keep water running down to the produce at all times. We would indicate to a truck driver that they should maintain the temperature at 38 degrees and so on, but the best insurance we feel we can have is by putting additional ice on the produce at the time it is loaded on the truck.

"So, what happens is, we get ice in blocks of 300 pounds and this piece of equipment that he is referring to is an ice crusher with a blower and it makes it into like snow. It is call-

ed snow ice or crushed ice, and that is blown onto these crates after they are put on the truck."

On cross-examination, Mays was questioned about the radish and onion operation which also include use of the "packing house" facilities. [1]

The onions are pulled from the ground and put into two, three or four dozen containers and run through a water spray machine.

After the radishes are cut, cooled and washed, they are placed into cellophane bags, six ounces to a bag, and thirty bags to a box. The washing machine was described as necessary because of the clinging black muck dirt and the cooling required to avoid spoilage.

The harvesting or gathering in of the crops by either the *Yoder* or *Benken* definition of agriculture constitutes an integral phase of "agriculture." In our view, the cooling of the lettuce and radishes to prevent spoilage is an essential phase of the harvesting process. Without the cooling operation, the cutting of the lettuce and radishes in the field would be a vain act. To say that the harvesting process is complete upon the cutting of the lettuce and radishes is to ignore reality. However, a resolution of this dispute on such a basis is, in our view, unnecessary.

Therefore, if we assume *arguendo* that the cooling, washing and packaging of the lettuce, onions and radishes in the packaging house facility commenced after the harvesting process was complete, we are compelled to address the question of whether those operations fall within that phase of the *Benken* definition of agriculture which includes "* * *in varying degrees the preparation of these products for man's use and their disposal."

No decision analyzing or applying the "varying degrees-preparation of product" phase of the definition are cited, nor do we find any. [2] The declaration of the Board of Tax Appeals

---

[1] The growing of radishes and onions was estimated to be less than 50 percent of the total operation and the growing of radishes about 30 percent of the total operation.

[2] The appellee cites *Crosset Co.* v. *Porterfield* (1969), 19 Ohio St. 2d. 143, as support for its position. However, that decision is based on a different factual pattern and does not cope with the *Benken* definition of agriculture.

that the "mechanical apparatus which cools, bags merchandise, and otherwise handles products are utilized more in commercial merchandising than in argiculture"serves only to beg the question of how the *Benken* definition is to be applied. The fact that the cooling, washing and bagging of the products on the premises of the grower is a preliminary step in the ultimate sale of the product to the consumer does not, in our view, exclude, without further inquiry, the machinery used in such a process from the exemption. That phase of the approved definition of agriculture embracing "in varying degrees the preparation of these products for man's use" includes conduct after harvesting designed to accomplish the sale of the product to the consumer. However, the phrase "in varying degrees" limits that conduct. Fixing and applying that limitation is required. In our view, the limitation is historical in nature and encompasses the traditional conduct of the farmer designed to preserve and prepare his product for delivery to the market.

In the case before us, the appellant, engages in a sophisticated farming operation, producing lettuce, radishes and onions on a large scale. Nevertheless, the washing, cooling and packaging of the produce in the "packing house facility" fall within the traditional conduct of the farmer designed to preserve and prepare his product for delivery to market.

Accordingly, we find the decision of the Board of Tax Appeals denying an exemption to the personal property used in the packaging house facility to be unreasonable and unlawful. The sole assigned error is sustained.

The ruling of the Board of Tax Appeals sustaining the determination of the Tax Commissioner that such machinery and equipment was subject to tax, is reversed and set aside, and the assessment by the Tax Commissioner against Appellant is vacated.

*Judgment reversed.*

RUTHERFORD, P. J., and PUTMAN, J., concur.